IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EBRAHIM WAHAB,                                          Case No. 3:23-cv-00098-SB

                Plaintiff,                            **OPINION AND ORDER**

      v.

SAIMA WAHAB,

                Defendant.

---

**BECKERMAN, U.S. Magistrate Judge.**

       Plaintiff Ebrahim Wahab ("Plaintiff"), a self-represented litigant, filed a defamation per se claim against his niece, Defendant Saima Wahab ("Defendant"). Defendant answered and filed counterclaims against Plaintiff for sexual battery of a child and intentional infliction of emotional distress ("IIED"). The Court recently granted Defendant's motion for summary judgment on Plaintiff's defamation claim. As a result, the only remaining claims in this case are Defendant's counterclaims.[1]

---

[1] Ebrahim Wahab is the "plaintiff/counterclaim defendant" and Saima Wahab is the "defendant/counterclaimant." *See Westwood Apex v. Contreras*, 644 F.3d 799, 802 n.1 (9th Cir. 2011) ("The parties and pleadings refer to [the plaintiff] Westwood Apex as a 'cross-defendant' as opposed to a 'counterclaim defendant.' . . . [T]he appropriate way to describe the underlying proceedings is that [the] defendant Contreras filed a counterclaim against plaintiff/counterclaim

The Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a), and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). For the reasons explained below, the Court enters summary judgment for Plaintiff on Defendant's counterclaims.

## PROCEDURAL HISTORY[2]

On August 2, 2024, the Court granted Defendant's motion for summary judgment on Plaintiff's defamation claim. (Op. & Order at 1-25, ECF No. 118.) On August 14, 2024, about three weeks before the pretrial conference scheduled for September 3, 2024, the Court advised the parties that their pretrial materials failed adequately to address the statute of limitations applicable to and timeliness of Defendant's counterclaims and the Court would consider entering summary judgment on the counterclaims if it found they are time barred. (Pretrial Order at 1-3, ECF No. 142, citing *Portsmouth Square v. S'holders Protective Comm.*, 770 F.2d 866, 869 (9th Cir. 1985).)

In its Pretrial Order, the Court noted that there are only certain limited circumstances in which it may enter summary judgment on its own motion. *Id.* The Court cited the Ninth Circuit's guidance in *Portsmouth. See* 770 F.2d at 869 (stating that "under certain limited circumstances a district court may issue summary judgment on its own motion," and a court has "limited authority to grant summary judgment *sua sponte* in the context of a final pretrial conference"). Recognizing that "[o]ne purpose of the Rule 16 pretrial conference procedure is to promote

---

defendant Westwood Apex[.]"). For purposes of brevity and consistency with past opinions and because the nomenclature has no bearing on the outcome, the Court continues to refer to the parties as "Plaintiff" and "Defendant." *See id.* ("[A]ny deviations from this nomenclature are immaterial to the result in this case.").

[2] Given the parties' and Court's familiarity with the factual history of this case, the Court describes it below only as necessary to address issues related to whether Defendant timely filed her counterclaims.

efficiency and conserve judicial resources by identifying litigable issues prior to trial," the Ninth Circuit explained that a "court need not await a formal motion, or proceed to trial," if "the pretrial conference discloses that no material facts are in dispute and that the undisputed facts entitle one of the parties to judgment as a matter of law," because "under those circumstances," a court's "summary disposition of the case conserves scarce judicial resources." *Id.* (citation omitted).

The Court wanted to ensure that both parties, but in particular, the party against whom the Court may potentially enter judgment (here, Defendant), received a full and fair opportunity to be heard and develop and present facts and legal arguments in support of their positions. *See generally id.* at 869-70 (explaining that if a "court grants summary judgment in the absence of a formal motion, [the Ninth Circuit] review[s] the record closely to ensure that the party against whom judgment was entered had a full and fair opportunity to develop and present facts and legal arguments in support of its position," and that it is "preferable for . . . [a] court specifically to notify the parties that it intend[s] to consider granting summary judgment at the pretrial conference") (citation omitted). To that end, the Court ordered the parties to file supplemental trial briefs by August 26, 2024, addressing the application of the statute of limitations to Defendant's counterclaims, and advised that the parties could file declarations and exhibits in support of their briefs or cite the CM/ECF-generated pages corresponding to the records upon which they relied. (Pretrial Order at 2); *cf. Portsmouth*, 770 F.2d at 869-70 (noting that the appellant argued that the district court "denied it an opportunity to respond with affidavits and other evidence in support of its claim," but nevertheless affirming the district court's sua sponte dismissal at the final pretrial conference).

///

PAGE 3 – OPINION AND ORDER

The parties timely filed their supplemental briefs and declarations in support by August 26, 2024. Given that the parties' materials addressed a potentially case-dispositive issue and that a jury trial was scheduled to begin in two weeks, the Court bifurcated the pretrial conference into two phases, focusing first on the applicability of the statute of limitations to Defendant's counterclaims. *See generally Hardeman v. Monsanto Co.*, 997 F.3d 941, 952 (9th Cir. 2021) (noting that "[t]he district court bifurcated the pretrial proceedings" into two "phase[s]").

On August 28, 2024, the Court held a hearing as part of the first phase of the pretrial conference and the parties presented their statute of limitations-related arguments. Having considered the parties' filings and arguments, the Court grants summary judgment to Plaintiff on Defendant's counterclaims.[3]

## LEGAL STANDARDS[4]

"A grant of summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Albino v. Baca*, 747

---

[3] Plaintiff, a self-represented litigant, raised the issue of whether Defendant timely filed her counterclaims before the Court issued its Pretrial Order. (*See* Def.'s Am. Resp. Pl.'s Interrogs. at 7, ECF No. 109-4 at 7, responding to Plaintiff's interrogatories on January 25, 2024, including an interrogatory centered on a mid-1990s meeting at which Defendant accused Plaintiff of abusing her as a child and asking for an explanation as to "what prevented [Defendant] from . . . filing a claim against [Plaintiff] in the past 33 years or so"; *see also* Pl.'s Am. Resp. Def.'s Answer, Affirmative Defs., & Countercls. at 6, ECF No. 109, incorporating by reference Plaintiff's interrogatories and Defendant's amended responses, asking why Defendant "did not act on her allegations . . . before now," and suggesting that Defendant failed timely to act).

[4] The Court notes that (1) many of the facts discussed herein are undisputed, and (2) if there is a conflict, the Court resolves the conflict in Defendant's favor pursuant to the summary judgment standard described below. *See generally Portsmouth*, 770 F.2d at 868, 871 (describing the procedural history and noting that the district court accepted as true proposed findings of fact from the appellant's pretrial materials, and later stating that "[b]ecause the district court's [sua sponte] disposition of the case amount[ed] to a summary judgment, [the Ninth Circuit] set forth the facts in the light most favorable to [the party] . . . against which summary judgment was granted") (citation omitted).

F.3d 1162, 1168 (9th Cir. 2014) (en banc) (quoting FED. R. CIV. P. 56(a)). "[T]he mere existence of *some* alleged factual dispute . . . will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

"A material fact is one that is needed to prove (or defend against) a claim, as determined by the applicable substantive law." *Simmons v. G. Arnett*, 47 F.4th 927, 932 (9th Cir. 2022) (citing *Nat'l Am. Ins. Co. v. Certain Underwriters at Lloyd's London*, 93 F.3d 529, 533 (9th Cir. 1996)); *see also Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) ("A fact is 'material' only if it might affect the outcome of the case[.]" (quoting *Anderson*, 477 U.S. at 248)). "An issue of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party." *Brown v. Arizona*, 82 F.4th 863, 874 (9th Cir. 2023) (en banc) (quoting *Karasek v. Regents of Univ. of Cal.*, 956 F.3d 1093, 1104 (9th Cir. 2020)); *see also Fresno*, 771 F.3d at 1125 ("[A] dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." (quoting *Anderson*, 477 U.S. at 248)).

In determining whether a genuine issue of material fact exists, a court must view the evidence in the light most favorable to, and draw all justifiable inferences in favor of, the nonmoving party. *See McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 706 (9th Cir. 2019) (per curiam) ("The court views 'evidence in the light most favorable to the nonmoving party,' to determine 'whether genuine issues of material fact exist.'" (quoting *George v. Edholm*, 752 F.3d 1206, 1214 (9th Cir. 2014))); *Brown*, 82 F.4th at 874 ("When determining whether a genuine issue of material fact exists, [a court] 'must draw all justifiable inferences in favor of the

nonmoving party.'" (quoting *Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1189 (9th Cir. 2021))). In doing so, a "court . . . may not judge credibility, weigh the evidence, or resolve factual disputes[.]" *Clarkson v. Alaska Airlines, Inc.*, 59 F.4th 424, 437 (9th Cir. 2023) (citing *Anderson*, 477 U.S. at 255).

## DISCUSSION

All that remains in this action are Defendant's counterclaims against Plaintiff for sexual battery of a child and IIED. (Def.'s Answer, Affirmative Defs., & Countercls. ¶¶ 21-27, ECF No. 33.) For the reasons discussed below, the Court grants summary judgment in Plaintiff's favor on Defendant's counterclaims.

## I.    APPLICABLE LAW

### A.    Diversity Jurisdiction

The complete diversity requirement is met here. *See Wahab v. Wahab*, No. 3:23-cv-00098-SB, 2023 WL 5035662, at *1 & n.2 (D. Or. Aug. 8, 2023) (finding that the Court had diversity jurisdiction over Plaintiff's sole claim for defamation, and recognizing that the parties are diverse because Plaintiff and Defendant are citizens of Oregon and the District of Columbia, respectively (citing 28 U.S.C. § 1332(a) and *Strotek Corp. v. Air Transp. Ass'n of Am.*, 300 F.3d 1129, 1130-31 (9th Cir. 2002))). Defendant admits as much and seeks damages satisfying the amount-in-controversy requirement. (Def.'s Answer, Affirmative Defs., & Countercls. ¶¶ 1-2, 23, 27.)

Given these facts, the Court has diversity jurisdiction over Defendant's counterclaims. *See Alta Gold Mining Co. v. Aero-Nautical Leasing Corp.*, 656 F. App'x 316, 318 (9th Cir. 2016) ("Contrary to Clark's argument, the district court had diversity jurisdiction over Clark's claims and Aero-Nautical's counterclaims."); *cf. Bristol v. Hughes*, 797 F. App'x 366, 366 (9th Cir. 2020) (vacating and remanding the district court's dismissal for "lack of diversity

jurisdiction [a defendant's] counterclaims" because it was "not clear on review that the defective

[complete diversity] allegations . . . in [the] countercomplaint could not have been cured by

amendment"). Accordingly, Oregon substantive law applies to Defendant's counterclaims. *See*

*Or. Clinic, PC v. Fireman's Fund Ins. Co.*, 75 F.4th 1064, 1068 (9th Cir. 2023) (exercising

diversity jurisdiction and therefore applying Oregon law (citing *Alexander Mfg., Inc. Emp. Stock*

*Ownership Plan & Tr. v. Ill. Union Ins. Co.*, 560 F.3d 984, 986 (9th Cir. 2009))); *Baldin v. Wells*

*Fargo Bank, N.A.*, 704 F. App'x 715, 716 n.1 (9th Cir. 2017) (stating that "the substantive law of

the State of Oregon applies to this diversity claim" (citing *Zamani v. Carnes*, 491 F.3d 990, 995

(9th Cir. 2007))).

### B.    Oregon Law

Defendant's counterclaims are based on conduct constituting child abuse. (Def.'s

Answer, Affirmative Defs., & Countercls. ¶¶ 14-27.) Thus, and as Defendant acknowledges,

Oregon Revised Statutes ("ORS") § 12.117—which provides an "extended limitations period for

claims based on child abuse," *Fearing v. Bucher*, 977 P.2d 1163, 1168 (Or. 1999)—applies to

Defendant's counterclaims. (*See* Def.'s Answer, Affirmative Defs., & Countercls. ¶ 20, alleging

that Defendant's "counterclaims are timely" under ORS § 12.117); *see also Fearing*, 977 P.2d at

1164, 1168 (noting that the plaintiff, who "allege[d] sexual abuse that occurred [when he was a

minor and] more than [twenty] years before the filing of the complaint," "initiated the present

action . . . under the extended limitations period for claims based on child abuse contained in

ORS 12.117").

### 1.    ORS § 12.117

"Oregon statutory law provides a two-year limitations period generally applicable to

claims sounding in tort[,] . . . [and that] actions accruing while a plaintiff is a minor may be filed

up to one year after the plaintiff attains majority." *Doe 150 v. Archdiocese of Portland*, No. 08-

cv-00691-PK, 2010 WL 11531082, at *2 (D. Or. June 16, 2010) (citing OR. REV. STAT.

§§ 12.110, 12.160), *aff'd*, 469 F. App'x 641, 642-43 (9th Cir. 2012). As discussed, however,

ORS § 12.117(1) provides an extended limitations period for actions based on conduct that

constitutes child abuse:

> Notwithstanding ORS 12.110, 12.115 or 12.160, an action based on conduct that
> constitutes child abuse . . . that occurs while the person is under 18 years of age
> must be commenced before the person attains 40 years of age, or if the person has
> not discovered the causal connection between the injury and the child abuse, nor
> in the exercise of reasonable care should have discovered the causal connection
> between the injury and the child abuse, not more than five years from the date the
> person discovers or in the exercise of reasonable care should have discovered the
> causal connection between the child abuse and the injury, whichever period is
> longer.

OR. REV. STAT. § 12.117(1).[5]

"ORS [§] 12.117(2) defines 'child abuse' as used in ORS [§] 12.117(1)." *Sherman v.*

*Dep't Hum. Servs.*, 492 P.3d 31, 34 n.2 (Or. 2021) (en banc). ORS § 12.117(2)'s "definition

includes intentional physical and mental injury, rape, sexual abuse, and sexual exploitation of a

child." *Id.* Defendant's claims are based on conduct that falls squarely within this definition. (*See*

Def.'s Answer, Affirmative Defs., & Countercls. ¶¶ 16-18, 22-23, 27, alleging sexual abuse of a

child).

///

///

---

[5] "Effective January 1, 2010, [ORS § 12.117] was amended to provide a five-year rather
than three-year period for bringing suit after discovery of an injury or a causal connection
between a defendant's conduct and an injury." *Doe 150*, 2010 WL 11531082, at *2 n.2. The
"amendment is retroactively applicable, except as to cases that reached judgment prior to January
1, 2010." *Id.* (citation omitted). The Oregon legislature also amended ORS § 12.117(2)(B) in
2015, but that amendment is not material to the issues in this case. *See Doe v. Silverman*, 401
P.3d 793, 794 & n.2 (Or. Ct. App. 2017) (addressing the applicability of the current version of
ORS § 12.117(1) and noting that the Oregon "legislature subsequently amended ORS [§] 12.117
in 2015," but the "amendment did not amend the subsection of the statute that [was] at issue in
th[at] case").

2.    **Discovery Rule**

"The Oregon Supreme Court has provided . . . guidance for courts seeking to apply the

discovery rule in connection with [a] statute of limitations analysis[.]" *Doe 150*, 2010 WL

11531082, at *3 (citing *Gaston v. Parsons*, 864 P.2d 1319, 1323-24 (Or. 1994)); *see also Doe*

*150*, 469 F. App'x at 642-43 (affirming the district court's application of "the reasonable person

standard . . . through the Oregon discovery rule under ORS 12.117(1)"). Specifically, the Oregon

Supreme Court has explained that courts evaluate discovery under an objective, reasonable

person standard:

> To discover a particular element of legally cognizable harm, the plaintiff
> does not need to know to certainty that each particular element exists. The
> discovery rule is designed to give plaintiffs a reasonable opportunity to become
> aware of their claim. *See Frohs v. Greene*, 452 P.2d 564, 565 (Or. 1969)
> (discovery rule affords opportunity for plaintiff to discover that claim exists).
> Actual knowledge that each element is present is not required. On the other hand,
> a mere suspicion is insufficient to begin the statute of limitations to run. We
> believe that a quantum of awareness between the two extremes is contemplated by
> the statute. Therefore, the statute of limitations begins to run when the plaintiff
> knows or in the exercise of reasonable care should have known facts which would
> make a reasonable person aware of a substantial possibility that each of the three
> elements (harm, causation, and tortious conduct) exists.
>
> We emphasize that this is an objective test. In most cases, the inquiry will
> concern what a plaintiff should have known in the exercise of reasonable care. In
> such cases, the relevant inquiry is how a reasonable person of ordinary prudence
> would have acted in the same or similar situation. *See Woolston v. Wells*, 687 P.2d
> 144, 150 (Or. 1984) (reasonable care means what a reasonable person of ordinary
> prudence would do in the same or similar circumstances). Relevant to this
> analysis will be a plaintiff's failure to make a further inquiry if a reasonable
> person would have done so. The discovery rule does not protect those who sleep
> on their rights, but only those who, in exercising the diligence expected of a
> reasonable person, are unaware that they have suffered legally cognizable harm.

*Gaston*, 864 P.2d at 1323-24 (simplified); *see also T.R. v. Boy Scouts of Am.*, 181 P.3d 758, 764

(Or. 2008) (addressing the discovery rule and noting that "discovery is determined by [an]

objective, reasonable person standard" (citing *Doe v. Am. Red Cross*, 910 P.2d 364, 369-70 (Or.

1996))).

The Oregon Supreme Court has explained that "[i]n applying th[is] standard, a court must consider the facts from the perspective of a reasonable person in the circumstances of the plaintiff." *Doe 1 v. Lake Oswego Sch. Dist.*, 297 P.3d 1287, 1295 (Or. 2013) (citing *T.R.*, 181 P.3d at 766-67); *see also Estrada v. Fed. Express Corp.*, 445 P.3d 1276, 1283 (Or. Ct. App. 2019) (explaining that "[a]n objective [discovery] standard need not strip out all of the circumstances of a [plaintiff's] situation"). A plaintiff's "circumstances include, but are not limited to, [a] plaintiff's status as a minor, . . . the relationship between the parties, . . . and the nature of the harm suffered." *Doe 1*, 297 P.3d at 1295 (citing *T.R.*, 181 P.3d at 766-67, *Kaseberg v. Davis Wright Tremaine, LLP*, 265 P.3d 777, 782 (2011), and *Gaston*, 864 P.2d at 1323-24). A plaintiff's circumstances also include "representations made by the tortfeasor on which the plaintiff might reasonably rely, or by side effects of the tortious conduct that might act to 'mask' the harm the plaintiff suffered." *Doe 150*, 2010 WL 11531082, at *4 (citing *Gaston*, 864 P.2d at 1323-24).

## II.    ANALYSIS

There is no dispute that Defendant's counterclaims are based on allegations of "child abuse" as defined in ORS § 12.117(2), and subject to the statute of limitations under ORS § 12.117(1).

### A.    Matters of Law

A court may determine as a matter of law that claims based on conduct constituting child abuse are time-barred under ORS § 12.117(1). *See, e.g.*, *Doe 150*, 469 F. App'x at 642-43 (affirming the district court's determination as a matter of law that ORS § 12.117(1) barred claims based on "known [childhood] sexual abuse"). A court may do so if "the only conclusion a reasonable jury could reach is that the plaintiff knew or should have known the critical facts at a specified time and did not file suit within the requisite time thereafter." *T.R.*, 181 P.3d at 765

(noting that although generally a question for the jury, the "[a]pplication of the discovery accrual rule" is properly decided as a matter of law if the "only conclusion a reasonable jury could reach is that the plaintiff knew or should have known the critical facts at a specified time and did not file suit within the requisite time thereafter" (citing *Brown v. J.C. Penney Co.*, 688 P.2d 811, 817-18 (Or. 1984))); *see also Doe 150*, 469 F. App'x at 643 (recognizing that a court "can determine reasonableness as a matter of law based on its finding that 'the only conclusion a reasonable jury could reach is that the plaintiff knew or should have known the critical facts at a specified time and did not file suit within the requisite time thereafter'" (quoting *T.R.*, 181 P.3d at 765)); *B.J.G. v. Soc'y of the Holy Child Jesus*, No. 07-cv-00541-HA, 2008 WL 896061, at *10 (D. Or. Mar. 28, 2008) ("The only conclusion a reasonable jury could reach in light of these facts is that plaintiff knew, or should have known, both the substance of her injury, and the role that the nuns and their alleged conduct played in that injury."); *In re Roman Cath. Archbishop*, No. 04-37154, 2006 WL 2038642, at *6 (Bankr. D. Or. June 7, 2006) ("In this case, the evidence in the record would not support a finding by a rational jury that claimant acted with reasonable care. Therefore, summary judgment is appropriate.").

### B.    Illustrative Example

*Doe 150* is an illustrative example of when a court found, as a matter of law, that claims based on child abuse were time-barred under ORS § 12.117(1). The Court describes the case in detail below.

In *Doe 150*, the plaintiff, a sixty-five-year-old man, filed a suit against the Archdiocese of Portland ("Archdiocese") and Roman Catholic Archbishop of Portland ("Archbishop") on June 6, 2008. 2010 WL 11531082, at *1. The plaintiff alleged the "defendants' vicarious liability for sexual battery of a child and [IIED] on a theory of *respondeat superior*, and direct liability for fraud and for negligence." *Id.* In support, the plaintiff alleged that in the late 1950s, when he was

about thirteen years old, a priest engaged in "[g]rooming" behaviors before sexually abusing him on multiple occasions. *Id.* Around the time he turned eighteen, the plaintiff learned that "certain friends of his had been warned not to go near [the priest] because he was known or suspected to have sexually abused minors." *Id.* at *2. Decades later, the plaintiff "read[] [late 1990s and/or early 2000s] newspaper articles . . . regarding [the priest's] acts of sexual abuse of minors," the plaintiff's brother obtained "a favorable judgment or a favorable settlement in connection with his [2001] action" asserting that the same priest engaged in child sexual abuse, and the plaintiff received a January 2005 bankruptcy court notice advising recipients of an impending claims bar date for clergy sex abuse claims against the Archdiocese or Archbishop. *Id.*

At summary judgment, the plaintiff did "not allege or offer evidence that he ever repressed the memory that these incidents occurred," and acknowledged that "he knew he had 'been abused' at all times." *Id.* at *1. The plaintiff's "position [was] that he only realized he had 'been harmed' by the abuse he had suffered in late 2007 or early 2008, shortly before filing th[e] action." *Id.* Attempting to bolster "his position that he could not reasonably have understood that he had been harmed by the abuse he suffered at [the priest's] hands prior to late 2007 or early 2008," the plaintiff offered "opinion testimony [from] his treating mental health care provider." *Id.* at *2. The "therapist opine[d] that as a consequence of the abuse he suffered as a child, [the plaintiff] 'ha[d] limited insight into himself, and [was] not very psychologically minded, tending to minimize attending to internal thoughts and feelings, a psychological defense mechanism[.]'" *Id.* (ellipses omitted). The therapist also opined that the plaintiff "display[ed] 'a distinct tendency towards avoiding self-disclosure' and [was] 'likely to underestimate the psychological symptoms that [he] may be experiencing,'" that individuals with the plaintiff's "psychological profile 'are anxiously conformant to the expectations of others in authority' and 'have a notable blind spot to

recognizing and acknowledging psychological difficulties,'" and that the plaintiff was "damaged in such a way as to have caused him to avoid 'processing' the abuse experience fully until recently." *Id.*

For their purposes, the defendants did "not contest [the plaintiff's] testimony that he did not actually discover prior to late 2007 that the child abuse he suffered at [the priest's] hands had caused him cognizable harm"; rather, they "argue[d] that in the exercise of reasonable care [the plaintiff] *should* have discovered the causal connection between the abuse and his consequential harm" before the applicable deadline. *Id.* at *5. The district court "agree[d] with the defendants that no trier of fact could conclude that [the plaintiff's] failure to discover the causal connection between the childhood abuse and his consequent injury [before the deadline] was reasonable." *Id.*

At the outset, the district court reiterated that the plaintiff "concede[d] that he never repressed memory of the abusive acts themselves," and found it "noteworthy that [the plaintiff's] realization that he had, in fact, been harmed by [the priest's] abuse was not triggered by any particular event in [the plaintiff's] life or elicited in the course of therapy, but rather occurred, from [the plaintiff's] perspective, out of the blue, in the manner of an 'epiphany.'" *Id.* The district court then focused on the "occurrence of . . . three events," any one of which would have made a "reasonable person of ordinary prudence" aware of a "substantial possibility" that a claim might lie:

> [U]nder Oregon law[,] a plaintiff should, in the exercise of reasonable care, discover the causal connection between childhood abuse and consequent injury where a "reasonable person of ordinary prudence" would be aware of a "substantial possibility" that the elements of a cause of action are present, or would know facts that would cause a person of ordinary prudence to make "further inquiry" as to that possibility. *Gaston*, 864 P.2d at 1323-24. Here, [the plaintiff] concedes that he read newspaper articles regarding lawsuits arising out of [the priest's] acts of sexual abuse of minors in the late 1990's and/or early

2000's, that he was contemporaneously aware that in 2001 his own older brother filed a successful lawsuit arising out of abuse he had suffered at [the priest's] hands, and that when in January 2005 he read the bankruptcy court's notice of the claims bar date he understood that he "may" have had a claim against the Archdiocese. Upon the occurrence of *any* of these three events, a reasonable person of ordinary prudence *who was aware* that he had suffered childhood sex abuse at [the priest's] hands would necessarily have made "further inquiry" to determine whether he might have a claim against the Archdiocese and/or Archbishop arising out of such abuse, and moreover even absent such further inquiry would necessarily have been aware of the "substantial possibility" that such a claim might lie.

*Id.* (emphasis added).

The district court's final observations concerned the plaintiff's mental health treatment and position that the nature of his injury effectively "masked" the connection between his abuse and injury:

[The plaintiff] argues that the nature of his injury caused him to be unable to appreciate that he had been harmed by [the priest's] abuse until the date when he came to the realization that he would sue the Archdiocese. [The court] find[s] it plausible that cognitive impairments like those discussed by [the plaintiff's] therapist could make it difficult for a reasonable person of ordinary prudence to appreciate the extent to which he had been harmed by childhood abuse. However, a reasonable person suffering from all of the cognitive impairments discussed by [the plaintiff's] therapist would nevertheless have been on notice that further inquiry could reveal the substantial possibility that he might have claims against the Archdiocese. Moreover, neither [the plaintiff] nor his therapist offers any answer to the question how it was that John came suddenly in late 2007 or early 2008, to the realization that he had been harmed by [the priest's] abuse—with no identifiable external event to trigger the realization—if he could not reasonably have been expected to reach the same realization [a few years earlier]. [The court] conclude[s] that [the plaintiff] has not raised a material question of fact as to whether the nature of his injury might reasonably have "masked" the causal connection between the childhood abuse and his consequential injury prior to 2007.

. . . [In summary], because no trier of fact could reasonably conclude that it was reasonable for [the plaintiff] to fail prior to June 6, 2003—approximately two years following [the plaintiff's] brother's successful lawsuit against the Archdiocese—to make the same discovery or inquiry, [the plaintiff's] claims are . . . time-barred under O.R.S. 12.117(1). [The] [d]efendants' motion for summary judgment is therefore granted as to each of [the plaintiff's] claims in this action.

*Id.* at *6.

On appeal, the plaintiff argued that the district court erred by (1) "usurp[ing] the role of the jury in determining the reasonableness of [the plaintiff's] delayed discovery as a question of law," and (2) "ignor[ing] the compelling testimony of [the plaintiff's] expert concerning whether the nature of [the plaintiff's] harm might reasonably have masked the causal connection between his childhood abuse and the consequent harm." 469 F. App'x at 642. The Ninth Circuit disagreed and affirmed. *Id.*

In so affirming, the Ninth Circuit stated that "the district court . . . found, as a matter of law, that upon the occurrence of any of several specific events, a reasonable person of ordinary prudence who was aware that he had suffered childhood sex abuse at the priest's hands would necessarily have been aware of the substantial possibility that [the plaintiff's] claim might lie," and that "[t]he district court's findings [were] correct." *Id.* at 642-43 (simplified). The Ninth Circuit described what the district court emphasized "[a]t the outset of its analysis," namely, that "in late 2007 or early 2008, [the plaintiff] suddenly had an epiphany in his dining room that the abuse, which [he] never forgot or repressed, had harmed him," and the plaintiff was "neither able to explain how he came to have such an epiphany nor why he did not have such revelation sooner." *Id.* at 643. The Ninth Circuit then turned to the "three events" upon which the district court relied:

> Additionally, the three events relied upon by the district court, in addition to the numerous other instances of notice in the record, would lead a reasonably prudent person in circumstances similar to [the plaintiff] to know of, or at least discover through inquiry, a substantial possibility that the known abuse led to his suffered harm prior to June 6, 2003[.] . . . Specifically, in 2001, [the plaintiff's] older brother had gone through a situation practically identical to that of [the plaintiff], had sued and won, and had even asked [the plaintiff] if he were going to file a claim. The district court also relied on the facts that [the plaintiff] received actual written notice of a potential claim against the Archdiocese, that he understood that he might have such claim, and that, at the time, he chose not to

pursue the claim. Such evidence supports the district court's conclusions with which we agree.

*Id.*

Like the district court, the Ninth Circuit concluded by finding unpersuasive the plaintiff's

argument and evidence that psychological barriers masked the connection between his abuse and

injury:

> [The plaintiff's] explanation that he did not conduct an investigation into the causal connection between his abuse and suffered harm because of "profound psychological barriers to the normal introspection and self-assessment that would have allowed [the plaintiff] to recognize such injury" is unpersuasive. The record is replete with facts that would have not only caused a reasonable person in [the plaintiff's] circumstances to investigate further, but would have caused [the plaintiff], if he would have inquired to any degree, to discover that he did in fact have a claim against the Archdiocese.
>
> Despite the objective evidence concerning [the plaintiff's] perceived inability to recognize the causal connection between his abuse and subsequent harm, and in light of the numerous events that occurred in [the plaintiff's] life before the bar date in conjunction with the fact that there is no reason in the record as to how or why [the plaintiff's] sudden realization occurred, [the plaintiff] fails to show that there is a "proper" question for the trier of fact. *See Anderson*, 477 U.S. at 249-50.

*Id.*

## C.    Defendant's Theory and Record of Delayed Discovery

### 1.    Defendant's Theory and Text Message

In her answer, affirmative defenses, and counterclaims, Defendant alleges that before

"May of 2022, [she] did not discover and could not have reasonably discovered the causal

connection between [Plaintiff's] abuse and [her] resulting injuries from the abuse itself."[6] (Def.'s

---

[6] As discussed further below, Defendant turned forty in 2016, Plaintiff filed this action on January 20, 2023, and Defendant filed her counterclaims on September 29, 2023. (*See* Compl. at 1; Def.'s Answer, Affirmative Defs., & Countercls. at 8-9, setting forth the filing dates; *id.* ¶¶ 14-16, stating that Defendant was born in 1976 and Defendant's counterclaims are based on abuse that began shortly after her father's 1979 kidnapping and occurred when she was "between three and five years of age"). For statute of limitations purposes, then, Defendant's counterclaims are

PAGE 16 – OPINION AND ORDER

Answer, Affirmative Defs., & Countercls. ¶ 20.) Defendant also alleges that "[t]he psychological effects of the abuse . . . prevented [her] from discovering the causal connection between the abuse and the injuries she suffered as a result of the abuse." (*Id.*) Consequently, Defendant alleges that she timely filed her counterclaims against Plaintiff pursuant to ORS § 12.117(1). (*Id.*)

Defendant cites "May of 2022" as a turning point in her discovery of the causal connection between her abuse and injuries because she attended a family event in May 2022, and not only "saw [Plaintiff] for the first time since the mid-1990s" but "[t]o her utter shock and horror, . . . witnessed [Plaintiff] hugging and touching her very young niece." (*Id.* ¶ 19.) Defendant "fled the family gathering" after "witnessing this interaction," and later "sent a text message to her family members with young children alerting [them] that she had been sexually assaulted as a child by [Plaintiff] and warning them to not allow their children to be harmed by [Plaintiff]." (*Id.*)

Defendant's message, which was the basis of Plaintiff's now-dismissed defamation per se claim, describes facts and circumstances relevant to Defendant's theory of delayed discovery, including, but not limited to, Defendant's previous disclosures and knowledge that Plaintiff abused her as a child:

> [Plaintiff] is a pedophile. He molested me when I was a child in [K]abul for months. It started when my father was taken and it went on until the pedophile left Afghanistan. Last night seeing him hug [a young family member] broke my heart. I feel that I have to stop hiding this truth. It's not my shame. It's his. My fight and

---

only timely if, in the exercise of reasonable care, she could not have been expected to discover the causal link between the abuse she suffered and any consequential injury before September 29, 2018. *See Doe 150*, 2010 WL 11531082, at *4 ("This action was filed June 6, 2008. [Plaintiff] attained the age of 40 in 1985. Thus, [plaintiff's] claim may only be timely for statute of limitations purposes if in the exercise of reasonable care he could not have been expected to discover the causal link between the abuse he suffered and any consequential injury prior to June 6, 2003.").

fall out with [Plaintiff's two brothers] were also a direct result of them choosing a child molester over me. When the pedophile came to live with us in [Portland], I told [Plaintiff's brothers] what he had done to me as a child. I told them I couldn't live having him in my life, and they both picked their brother over me. It's a choice they made and their choice made me realize how weak [Plaintiff's brothers] are. I decided to go my separate ways, and I have not regretted my decision. I do know both [of Plaintiff's brothers] are sorry now but I can't forgive them for threatening to get the pedophile a lawyer to sue me if I went public about the abuse[,] [w]hich is what [Plaintiff's eldest brother did] in my final argument with him.

I am not rehashing the past to get your sympathy or ask for understanding. I am only telling you all because now you have daughters and you have sons and I see you are giving a pedophile access to your children, not knowing what he's capable of. It's my obligation to warn you that your children are not safe around him. If you still choose to socialize with him, it's on you. I am telling you in clear language he is a child molester, and once a child molester, always a child molester. There is no need for any[] of you to message or respond to this message because I know some of you would be forced to finally pick a side which makes you uncomfortable but I am more concerned about your children. They need protection from the evil around them. But if you need to talk about this, like I said, it's not my shame. I will talk. It's the truth and if [Plaintiff's brothers] were half the men they think they are, they would've stood by me and right now [Plaintiff] would not be having dinner with your children. Only in [an] Afghan family, a child molester would be protected to protect the family name. In any decent society, he would be forced to register as a pedophile, and would be jailed if he was seen hugging a child.

(Compl. at 8-10, ECF No. 2; *see also* Def.'s Answer, Affirmative Defs., & Countercls. ¶¶ 4, 6,

admitting that Defendant sent the text message and stated that "Plaintiff molested [her] when she

was a child").

Taken together, Defendant's May 2022 message and operative pleading reflect that she

previously disclosed known sexual abuse to other family members, including Plaintiff's eldest

brother, in the mid-1990s. (*See* Def.'s Answer, Affirmative Defs., & Countercls. ¶ 18, alleging as

much). The record includes additional details about Defendant's mid-1990s disclosures of known

sexual abuse.

///

///

### 2.        Defendant's Deposition Testimony

Defendant described her mid-1990s disclosures and knowledge of childhood sexual abuse throughout her deposition testimony. (*See* Dep. Saima Wahab ("Def.'s Dep.") 6:1-190:8, Apr. 29, 2024, ECF No. 167.) For present purposes, the Court relies primarily on Defendant's own testimony.

In May 1991, Defendant moved to the United States to live with her uncle and Plaintiff's eldest brother, Zaher Wahab. (Def.'s Dep. 33:21-34:13, 181:11-182:6; *see also* Def.'s Answer, Affirmative Defs., & Countercls. ¶¶ 14, 18, representing that Defendant's father had several brothers, including Plaintiff and the "eldest" brother, Zaher Wahab). Between May and September 1991, the "routine" for Defendant, Defendant's siblings (Khalid and Najiba Wahab), and Defendant's cousins (Aziz, Emal, and Jamila Wahab)—all of whom lived with Zaher Wahab—consisted of working with an English tutor at Zaher Wahab's home. (*See* Def.'s Dep. 33:21-34:13, 86:21:87:7, 136:20-137:25, 154:4:6, 158:15-159:3, 181:11-25, using the plural "we" and "us" at times but also identifying the six Wahab children who were siblings or cousins and initially lived and moved together in Oregon; Def.'s Am. Resp. Pl.'s Interrogs. at 3, stating that Defendant sent the May 2022 message to her siblings and the cousins with whom she previously lived; Dep. Zaher Wahab 48:12-50:3, Mar. 21, 2024, ECF No. 109-7, showing that around the "spring of 1991," all six children moved to the United States to live with Zaher Wahab).

In September 1991, when she was about fifteen years old, Defendant enrolled as a sophomore at a local public high school. (Def.'s Dep. 181:17-182:5; *see also* Def.'s Answer, Affirmative Defs., & Countercls. ¶ 14, alleging that Defendant was born in 1976; Def.'s Dep. 7:12-20, 89:8-90:1, reflecting that Defendant identified her "legal birthday" as falling in early September 1976 but added that one of her uncles said that it actually fell in early February

PAGE 19 – OPINION AND ORDER

1976).[7] In or around September 1993, when Defendant was about seventeen years old and near the beginning of Defendant's senior year of high school, Defendant, Defendant's siblings, and Defendant's cousins moved into the home of their other uncle, Amin Wahab, on "Garden Home Road." (Def.'s Dep. 32:19-34:13, 36:17-37:8; *see also* Dep. Zaher Wahab 49:5-50:2, noting that Zaher Wahab's brother, Amin Wahab, also lived in Oregon when the Wahab children arrived in 1991).

Also in or around September 1993, Defendant reported for the first time to her uncles, Zaher and Amin Wahab, that Plaintiff abused her as a child.[8] (*See* Def.'s Dep. 36:17-37:8, "Q. . . . [T]ell me . . . the date, the month, and the year when you told Zaher and Amin about the alleged abuse by [Plaintiff]. A. When [Plaintiff] brought [his] van . . . to Garden Home Road . . . which was 1993 . . . . Q. Let's -- you said September of 1993? A. I said September-ish. . . . Since these were all our family homes, there wasn't a move in date -- exact date. We moved our stuff from Zaher's house to the Garden Home house over several weeks. So it's hard to give you the exact date. I'm giving you the range of it."; *id.* at 182:6-12, "Q. . . . When you

---

[7] Defendant is "unaware of her true date of birth" and "cannot attest to the accuracy of her date of birth," because "she was not issued a birth certificate, as was the custom in Afghanistan at the time of [her] birth." (Def.'s Am. Resp. Pl.'s Interrogs. at 3.) Defendant believes that her uncle, Zaher Wahab, "who was not in Afghanistan at the time of [her] birth," arbitrarily selected and entered the September 1976 birth date on her "official documentation." (*Id.*) As discussed herein, although Defendant is unaware of her exact birth date, Defendant's counterclaims are predicated on her more general assertions that she was born in 1976, that Plaintiff's abuse began shortly after her father's kidnapping in 1979, and that "at the time of the assaults [she was] between three and five years of age." (Def.'s Answer, Affirmative Defs., & Countercls. ¶¶ 14-16.) Thus, it is undisputed that Defendant was born at some point in 1976. Accordingly, Defendant would have turned eighteen and forty years old in 1994 and 2016, respectively.

[8] Defendant reports that her childhood abuse ended in the early 1980s because her mother "caught [Plaintiff] in the act of assaulting her," took her to a "doctor for medical evaluation and treatment," and "reported her . . . assault" to "the authorities" in Afghanistan. (Def.'s Answer, Affirmative Defs., & Countercls. ¶ 17; Def.'s Trial Br. at 2, ECF No. 127.)

came to the United States . . . , did you immediately bring up this topic [of] your childhood

molestation with your uncles or did you wait? A. As I answered before, after [Plaintiff] moved

in[to] [Amin Wahab's garage on Garden Home Road] in 1993."; *see also id.* at 136:25-137:25,

describing where Plaintiff and the Wahab children resided after Plaintiff moved to Garden Home

Road).

During her deposition, Defendant testified that she "remember[s]" details about when

Plaintiff abused her as a child and later threatened that if she "said anything to anyone, [Plaintiff]

would make [her] mother disappear the way [her] father [had recently] disappeared" in

Afghanistan. (*See id.* at 49:20-51:25, 52:15-54:2, demonstrating as much and adding that

contrary to the suggestion that Defendant did not report the incidents, Defendant "told

[Plaintiff's] brother in the US as an adult" about the previously described abuse; *see also id.* at

22:18-23:24, reflecting that Defendant recounted that Plaintiff "molested [Defendant]" as a child

and responded to a question about her memory of certain dates by stating that "an experience that

happens to you is a lot easier to remember than to remember what month and what date and what

year it was"). Defendant further testified that her reporting of abuse was not limited to her initial

disclosure to her uncles in or around September 1993 and at the age of seventeen; rather, there

were several "family meetings"/"many conversations" during which she reported the abuse to

Zaher and Amin Wahab, her siblings, her cousins, and occasionally Plaintiff. (*See id.* at 140:20-

144:22, 152:3-155:4, 158:3-161:10, noting that the "family meetings"/"conversations" "[o]ften"

but did not always involve eight family members, Defendant, Amin Wahab, Zaher Wahab,

Defendant's siblings, and Defendant's cousins, as well as Plaintiff on some "[o]ccasion[s]," and

describing how Defendant "told [Plaintiff's] brother in the US as an adult" about Plaintiff

abusing her as a child, Defendant confided in her brother, Khalid Wahab, who "would see [her]

cry" because she had "many conversations" and "fight[s] with [her] uncles" about Plaintiff abusing her, Defendant's cousins knew that "there was a lot of tension, and that there [were] family meetings, which ended with [Defendant] crying and begging, and asking [her uncles] to do something," and Defendant's younger sister "cried" and "sympathized" with Defendant about the abuse).

Defendant could not recall an exact number but testified that beginning in September 1993, "[t]here were many" or "[s]everal" meetings "[s]paced out" over the span of "[a]bout five years, and the meetings often "ended with [her] crying and begging and asking [her uncles] to do something." (*Id.* at 140:20-144:22, 152:3-157:20, 158:3-161:10; Def.'s Am. Resp. Pl.'s Interrogs. at 4-5, stating that beginning in "late 1993," there were multiple meetings between Defendant and her uncles about the abuse). Although Defendant's uncles wanted to protect their "family name," instructed her to "stay silent," and called her "ungrateful," Defendant testified that she "wouldn't give up" for five years, "kept asking [her uncles] to do something," and continued to implore her uncles to "take actions" to "punish" Plaintiff or "let somebody else punish [Plaintiff] if they couldn't do it," to "protect" her, to "get [Plaintiff] out of [her] life," and to prevent her from "hav[ing] to see the person who" abused her. (Def.'s Dep. 140:20-144:22, 152:3-157:20, 158:3-161:10; Def.'s Am. Resp. Pl.'s Interrogs. at 4-5.) In seeking a punishment, Defendant expected "[w]hatever the punishment for [a] child molester was." (Def.'s Dep. 157:16-20, 160:4-21.) Defendant also remained vigilant about the possibility that Plaintiff may harm her siblings, which is why "she made sure when [Plaintiff was alone] in the house [without Amin Wahab], [she] was with [her siblings] all the time . . . [and] knew that they were safe." (*Id.* at 167:7-23.)

///

In addition to suggesting that her uncles "let somebody else punish" Plaintiff if they were unwilling to do so and stating that she expected an appropriate "punishment for [a] child molester," Defendant testified that when she was "about [seventeen]" years old—i.e., in or around September 1993, when she first disclosed to her uncles that Plaintiff abused her as a child—she "left it up to" her uncles to decide how to punish Plaintiff but she "did suggest legal means." (*Id.* at 159:20-161:10; *see also id.* at 36:17-37:8, 182:6-12, estimating an initial disclosure range in or around September 1993; Def.'s Am. Resp. Pl.'s Interrogs. at 4-5, providing a similar range of "[s]ometime [in] late 1993"). According to Defendant, the five-year period in which she reported the abuse and asked her uncles to punish Plaintiff closed "towards the end of [19]98," after she graduated from Lewis and Clark College ("Lewis and Clark") and Amin Wahab "kicked [her] out of [his] house[.]" (*Id.* at 152:3-157:20, 158:3-161:10, 161:12-163:12, 174:25-177:15; *see also* Def.'s Am. Resp. Pl.'s Interrogs. at 4, noting that Defendant graduated in May or June 1998).

Defendant explained that after she graduated from college, Amin Wahab informed Defendant that she needed to "get out" of his home if she was "not going to stay silent and . . . going to create a problem for [the Wahab] family," and therefore Defendant "moved out" rather than "[s]uffer in silence" and "[e]at dinner" with her abuser. (Def.'s Dep. at 152:3-157:20, 158:3-161:10, 161:12-163:12, 174:25-177:15.) In a recently filed declaration, Defendant further explained that between the ages of seventeen and twenty-three, she "was forced to live with [her] abuser" because when she reported the abuse to and asked for the support of her uncles, they offered no support, "refus[ed] to make [Plaintiff] disappear," and "treat[ed] [her] differently because [she] was a woman." (Suppl. Decl. Saima Wahab Supp. Countercls. ("Def.'s Decl.") ¶ 3, ECF No. 152.) Defendant adds that she was "angry during this time at [her] uncles" because of

their response and decision to "ignore their obligations to [her as a result of] their religion and culture," she "moved out of [Amin Wahab's] house to create a life separate from [her] family," and she "saw [her] abuser for the first time in decades" at the May 2022 family gathering. (*Id.* ¶¶ 3-4.)

### 3.    Other Evidence and Past Representations

Defendant recounted many similar, "relevant facts" in her motion for summary judgment. (Def.'s Mot. Summ. J. at 3, ECF No. 100) (bold and all caps omitted). For example, Defendant recounted that "Plaintiff's assault of Defendant [has been] common knowledge amongst the Wahab family members since the mid-1990s."[9] (*Id.*) To that end, Amin Wahab "testified that sometime in 1996 he participated in a conversation during which Defendant stated that she had been sexually assaulted by Plaintiff when she was a child living in Afghanistan." (*Id.*, citing Dep. Amin Wahab 23:11-24:2, 24:23-25:9, 26:24-27:10, 42:21-46:5, Mar. 19, 2024, ECF No. 101-1 at 3-5.) Plaintiff, Plaintiff's eldest brother, Zaher Wahab, and Defendant's brother were also present at this meeting. (*Id.* at 3-4, citing Dep. Amin Wahab 43:4-13 and Dep. Zaher Wahab 95:23-96:5.)

Throughout this case, Plaintiff has similarly "admitted that he has known for over [twenty-five] years about Defendant telling members of the family that [Plaintiff] sexually

---

[9] The Court emphasizes that Defendant did not simply present facts in the light most favorable to the nonmoving party at the summary judgment stage (i.e., Plaintiff); rather, Defendant accurately described deposition and court hearing transcripts and presented legal arguments and defenses that depended on facts derived from the cited sources. (*See* Def.'s Mot. Summ. J. at 7, 9, arguing that Plaintiff's and Plaintiff's brothers' testimony "confirm that Defendant first reported that Plaintiff sexually assaulted her as a child in Afghanistan during a family meeting held in the mid-1990s," Defendant's May 2022 text message "conveyed in writing the same report of sexual assault she first reported in the mid-1990s," Defendant "made statements to other family members and to Plaintiff himself in the mid-1990s," and Defendant's "text is consistent with statements made decades earlier, closer in time to when the abuse happened").

assaulted her when she was a child in Afghanistan." (*Id.* at 3.) In fact, Plaintiff testified that "Defendant [told] him, Amin Wahab, Zaher Wahab, and Khalid Wahab that she was 'sexually abused' as a child by him." (*Id.*, quoting Dep. Ebrahim Wahab ("Pl.'s Dep.") 69:20-73:14, Apr. 30, 2024, ECF No. 101-4 at 3-4.) Plaintiff also testified that to the "[b]est of [his] memory and knowledge," Defendant reported this during a family meeting held "sometime in 1997." (Pl.'s Dep. 69:20-73:14.) Furthermore, during an in-person hearing and status conference held on March 6, 2024, Plaintiff informed the Court that he attended a 1997 meeting, at which Defendant "told her two [other] uncles, Amin and Zaher [Wahab], . . . that she was sexually assaulted by Plaintiff." (*See* Def.'s Mot. Summ. J. at 4, citing Ct. Hr'g Tr. 22:5-22, Mar. 6, 2024, ECF No. 101-3 at 4, reflecting that before his deposition, Plaintiff referenced "four" total attendees at this meeting).

Similar to Plaintiff, Amin Wahab testified that the 1996 meeting occurred when Defendant was "an adult" and "junior or [so] . . . in college" and "around th[e] time" or shortly before he purchased a new home (i.e., a purchase he made "late in the year" in 1996), which is where Amin Wahab, Defendant, and two of Defendant's cousins later resided. (Dep. Amin Wahab 23:11-28:24, 42:21-49:17; *see also* Dep. Saima Wahab ("Def.'s Dep.") 7:10-18, Apr. 29, 2024, ECF No. 111-1 at 1, reflecting that Defendant provided testimony on her "legal birthday," which falls in September 1976). Like Amin Wahab, Zaher Wahab estimated that the meeting at his home and involving Plaintiff, Plaintiff's brothers, and Defendant, who was "upset," occurred when Defendant was in her "first year or second year of college."[10] (Dep. Zaher Wahab 73:6-13, ECF No. 108-8.)

///

---

[10] Zaher Wahab, who is around eighty years old, was a long-time professor at Lewis and Clark. (Dep. Zaher Wahab 5:15-24, 97:18-25.)

With respect to how Plaintiff's brothers responded to Defendant's reports of abuse, Amin Wahab testified that based on his "recollection" of the 1996 meeting, Zaher Wahab told Defendant that "fil[ing] a lawsuit . . . would be an option" or to "file a lawsuit," and later added that Zaher Wahab "probably . . . meant" that Defendant could take her report "to the police or the court[.]" (Dep. Amin Wahab 27:1-28:16.) Zaher Wahab testified that during the meeting, he told Defendant that if she believed she "ha[d] a case" against Plaintiff, she was a "grown[-]up" and "should go ahead and . . . bring this up to . . . a lawyer or the police or the court."[11] (Dep. Zaher Wahab 73:6-23.)

In addition to the foregoing, Defendant's cousin, Jamila Wahab, testified that "it became clear well after the mid-1990s family discussion, but [years] before the [May 2022] text message at issue, [that] members of the Wahab family continued to share [Defendant's] report of Plaintiff's sexual assault of Defendant." (Def.'s Mot. Summ. J. at 4, citing Dep. Jamila Wahab 36:2-38:24, 39:18-40:23, Apr. 16, 2024, ECF No. 101-5 at 3-4.) Specifically, Jamila Wahab testified that before she received the May 2022 text message, there were "probably . . . multiple occasions" in which her mother told her children about Defendant's claim that Plaintiff molested her when she was a child, or at least "something along th[e] lines" of what Defendant's text claimed. (Dep. Jamila Wahab 36:18-38:21.) Jamila Wahab further testified that her mother was attempting to address Defendant's and Defendant's uncles' ongoing "tension," "unresolved issue," and inability to "get[] along," all of which related to Defendant's uncles' handling of Defendant's allegations against Plaintiff. (*Id.*) Jamila Wahab also testified that she "assum[ed]" that her mother first raised these issues "around the time" she "graduated college" (i.e., Jamila

---

[11] Defendant's counsel stated at the hearing on this matter that Defendant disputes these statements. However, as discussed, Defendant testified at her deposition that she suggested to her uncles "legal means" to punish Plaintiff many years ago. (Def.'s Dep. 159:20-161:10.)

Wahab graduated from college not long before her parents moved to the United States in 2007 ) but after her 2008 marriage. (*Id.*)

### D.    Disposition

The Court finds that a reasonable person in Defendant's circumstances in the exercise of reasonable care should have discovered the causal connection between Plaintiff's abuse and Defendant's resulting injuries before September 29, 2018, and that no reasonable trier of fact could conclude otherwise.

Defendant alleges that before "May of 2022, [she] did not discover and could not have reasonably discovered the causal connection between [Plaintiff's] abuse and [her] resulting injuries from the abuse itself." (Def.'s Answer, Affirmative Defs., & Countercls. ¶ 20.) Defendant also alleges that "[t]he psychological effects of the abuse . . . prevented [her] from discovering the causal connection between the abuse and the injuries she suffered as a result of the abuse." (*Id*.) As such, Defendant alleges that her counterclaims are timely under ORS § 12.117(1). (*Id.*)

In support of her delayed discovery theory, Defendant relies in part on the testimony of Anna Rose Bick-Mera ("Bick-Mera"), a licensed clinical social worker who has treated Defendant since November 2023. (Def.'s Expert Witness Disclosure at 2, ECF No. 134; *see also* Suppl. Decl. Anna Rose Bick-Mera Supp. Countercls. ("Bick-Mera Decl.") at 1-4, ECF No. 154.) Bick-Mera diagnosed Plaintiff with post-traumatic stress disorder ("PTSD"). (Def.'s Expert Witness Disclosure at 2.) At trial, Bick-Mera would have testified that Defendant "experienced some of the symptoms associated with PTSD throughout the years following her childhood abuse by [P]laintiff," but she "did not meet the full diagnostic criteria for PTSD until May of 2022 when she [was] triggered by seeing [Plaintiff] . . . at a family event." (*Id.* at 2-3.) Bick-Mera also would have testified that after the May 2022 event, Defendant "experienced

PTSD symptoms, including[,] but not limited to, flashbacks, nightmares, insomnia, fragmented sleep, emotional flooding, anxiety, depression, [and] loss of enjoyment of usual social and employment activities." (*Id.* at 3.)

Defendant turned forty in 2016, Plaintiff filed this action on January 20, 2023, and Defendant filed her counterclaims on September 29, 2023. (*See* Compl. at 1; Def.'s Answer, Affirmative Defs., & Countercls. at 8-9, setting forth the filing dates; *id.* ¶¶ 14-16, stating that Defendant was born in 1976 and Defendant's counterclaims are based on abuse that began shortly after her father's 1979 kidnapping and occurred when she was "between three and five years of age"). For statute of limitations purposes, then, Defendant's counterclaims are only timely if, in the exercise of reasonable care, she could not have been expected to discover the causal link between the abuse she suffered and any consequential injury before September 29, 2018. *See Doe 150*, 2010 WL 11531082, at *4 ("This action was filed June 6, 2008. [The plaintiff] attained the age of 40 in 1985. Thus, [the plaintiff's] claim may only be timely for statute of limitations purposes if in the exercise of reasonable care he could not have been expected to discover the causal link between the abuse he suffered and any consequential injury prior to June 6, 2003."); OR. REV. STAT. § 12.117(1) (recognizing that an action like this "must be commenced before the person attains 40 years of age, or if the person has not discovered the causal connection between the injury and the child abuse, nor in the exercise of reasonable care should have discovered the causal connection between the injury and the child abuse, not more than five years from the date the person discovers or in the exercise of reasonable care should have discovered the causal connection between the child abuse and the injury, whichever period is longer").

///

The Court focuses on the time period in which Defendant was around eighteen years old and older and resided in the United States (the mid-1990s to the present). Similar to *Doe 150*, the Court emphasizes at the outset that Defendant does not claim that she forgot or repressed her memories of the abuse, which she acknowledges "did cause harmful and offensive contact with [Defendant.]" (Def.'s Answer, Affirmative Defs., & Countercls. ¶ 22); *see Doe 150*, 469 F. App'x at 643 (noting the emphasis at the outset of the district court's analysis that the plaintiff "never forgot or repressed" memories of the abuse, which "had harmed him"); *Doe 150*, 2010 WL 11531082, at *5 ("John concedes that he never repressed memory of the abusive acts themselves.").

The record before the Court clearly supports that Defendant remembers Plaintiff's abuse. Defendant testified that she "remember[s]" details about when Plaintiff abused her as a child and later threatened that if she "said anything to anyone, [Plaintiff] would make [her] mother disappear the way [her] father [had recently] disappeared" in Afghanistan. (*See id.* at 49:20-51:25, 52:15-54:2, stating as much and adding that contrary to the suggestion that Defendant did not report the incidents, Defendant "told [Plaintiff's] brother in the US as an adult" about the previously described abuse; *see also id.* at 22:18-23:24, reflecting that Defendant recounted that Plaintiff "molested [Defendant]" as a child and responded to a question about her memory of certain dates by stating that "an experience that happens to you is a lot easier to remember than to remember what month and what date and what year it was").

Defendant also testified that her reporting of the abuse was not limited to her initial disclosure to her uncles in or around September 1993 at the age of seventeen; rather, there were several "family meetings" and "many conversations" during which she reported the abuse to Zaher and Amin Wahab, her siblings, her cousins, and occasionally Plaintiff. (*See id.* at 140:20-

144:22, 152:3-155:4, 158:3-161:10, noting that the "family meetings"/"conversations" "[o]ften" but did not always involve eight family members, Defendant, Amin Wahab, Zaher Wahab, Defendant's siblings, and Defendant's cousins, as well as Plaintiff on some "[o]ccasion[s]," and describing how Defendant "told [Plaintiff's] brother in the US as an adult" about Plaintiff abusing her as a child, Defendant confided in her brother, Khalid Wahab, who "would see [her] cry" because she had "many conversations" and "fight[s] with [her] uncles" about Plaintiff abusing her, Defendant's cousins knew that "there was a lot of tension, and that there was family meetings, which ended with [Defendant] crying and begging, and asking [her uncles] to do something," and Defendant's younger sister "cried" and "sympathized" with Defendant about the abuse).

Further, Defendant could not recall an exact number but testified that beginning in September 1993, "[t]here were many" or "[s]everal" meetings "[s]paced out" over the span of "[a]bout five" years, and the meetings often "ended with [her] crying and begging and asking [her uncles] to do something." (*Id.* at 140:20-144:22, 152:3-157:20, 158:3-161:10; Def.'s Am. Resp. Pl.'s Interrogs. at 4-5, stating that beginning in "late 1993," there were multiple meetings between Defendant and her uncles about the abuse). Defendant's uncles wanted to protect their "family name," instructed her to "stay silent," and called her "ungrateful," but Defendant testified that she "wouldn't give up" for five years, "kept asking [her uncles] to do something," and continued to implore her uncles to "take actions" to "punish" Plaintiff or "let somebody else punish [Plaintiff] if they couldn't do it," to "protect" her, to "get [Plaintiff] out of [her] life," and to prevent her from "hav[ing] to see the person who" abused her. (Def.'s Dep. 140:20-144:22, 152:3-157:20, 158:3-161:10; Def.'s Am. Resp. Pl.'s Interrogs. at 4-5.) In seeking punishment for Plaintiff's abuse, Defendant expected "[w]hatever the punishment for [a] child molester was."

(Def.'s Dep. 157:16-20, 160:4-21.) Defendant also remained vigilant about the possibility that Plaintiff may harm her siblings, which is why "she made sure when [Plaintiff was alone] in the house [without Amin Wahab], [she] was with [her siblings] all the time . . . [and] knew that they were safe." (*Id.* at 167:7-23.)

In addition to suggesting that her uncles "let somebody else punish" Plaintiff if they were unwilling to do something themselves and stating that she expected an appropriate "punishment for [a] child molester," Defendant testified that when she was "about [seventeen]" years old— i.e., in or around September 1993, when she first disclosed to her uncles that Plaintiff abused her as a child—she "left it up to" her uncles to decide how to punish Plaintiff but she "did suggest legal means." (*Id.* at 159:20-161:10; *see also id.* at 36:17-37:8, 182:6-12, estimating an initial disclosure range in or around September 1993; Def.'s Am. Resp. Pl.'s Interrogs. at 4-5, providing a similar range of "[s]ometime [in] late 1993"). According to Defendant, the five-year period in which she reported the abuse and asked her uncles to punish Plaintiff closed "towards the end of [19]98," after she graduated from Lewis and Clark and Amin Wahab "kicked [her] out of [his] house[.]" (*Id.* at 152:3-157:20, 158:3-161:10, 161:12-163:12, 174:25-177:15; *see also* Def.'s Am. Resp. Pl.'s Interrogs. at 4, noting that Defendant graduated from Lewis and Clark in May or June 1998).

Relatedly, Defendant has on multiple occasions during this litigation acknowledged that "Plaintiff's assault of Defendant [has been] common knowledge amongst the Wahab family members since the mid-1990s." (*See, e.g.*, Def.'s Mot. Summ. J. at 3.) As discussed above, Defendant's reference to "Wahab family members" includes, but is not limited to, Defendant's uncles, mother, brother, and cousin's family, and all of these Wahab family members possess such knowledge because of their direct or indirect of awareness of Defendant's reports of abuse.

PAGE 31 – OPINION AND ORDER

Thus, the undisputed factual record reflects that Defendant recalled the abuse and disclosed it frequently to extended family members beginning at least in the 1990s.

Addressing her memories of the abuse that she suffered and awareness of the causal connection between the abuse and the consequential harm, Defendant emphasizes that after witnessing Plaintiff hug a young family member at the family gathering in May 2022, she "experienced a flood of memories of the sexual assaults committed by [Plaintiff]." (Def.'s Trial Br. at 3; *see also* Def.'s Answer, Affirmative Defs., & Countercls. ¶¶ 19-20; Def.'s Am. Resp. Pl.'s Interrogs. at 7, addressing similar or related matters). Defendant explains that "[t]hese memories then caused and continued to cause her significant emotional distress demonstrated by flashbacks, nightmares, insomnia, fragmented sleep, emotional flooding, anxiety, depression, loss of enjoyment of social activities, and the inability to seek employment." (Def.'s Trial Br. at 3.)

Given Defendant's reported abuse and the fact that Defendant, who had not seen Plaintiff "since the mid-1990s," witnessed Plaintiff hug a young family member, it is understandable (and the Court does not question) that Defendant was "shock[ed] and horr[ified]" and "experienced a flood of memories of the sexual assaults by [Plaintiff]." (Def.'s Trial Br. at 3; Def.'s Answer, Affirmative Defs., & Countercls. ¶ 19.) Importantly, however, the 2022 incident did not involve the discovery of a repressed memory. *See Kraft v. St. John Lutheran Church*, 414 F.3d 943, 947 n.3 (8th Cir. 2005) (noting that the plaintiff "argue[d] that there was disputed evidence concerning when he actually discovered that the abuse caused his injuries," and the "case [did] not involve the discovery of a repressed memory" because he "ha[d] always retained an awareness of the facts of the claimed abuse").

///

Further, the record reflects that Defendant suffered harm resulting from Plaintiff's abuse prior to the 2022 incident. For example, Bick-Mera, who established a treatment relationship with Defendant in November 2023, would have testified at trial that Defendant "experienced some of the symptoms associated with PTSD throughout the years following her childhood abuse by [Plaintiff]." (Def.'s Expert Witness Disclosure at 2.) Although Bick-Mera explains in her recently filed supplemental declaration that Defendant "did not meet the criteria for a diagnosis of PTSD" between the ages of seventeen to twenty-three or during the decades preceding May 2022, and that the May 2022 event "trigger[ed] the delayed onset PTSD" (Bick-Mera Decl. ¶¶ 3-7), Bick-Mera does not disavow her earlier statements that Defendant also suffered from PTSD symptoms throughout the years following the childhood abuse. Further, the events that occurred in the 1990s when Defendant initially disclosed the abuse to her extended family demonstrate that Defendant was experiencing harm as a result of the abuse in her early adulthood. *See generally Wilson*, 2021 WL 3779630, at *4 (noting that the plaintiff "identif[ied] [a defendant] as the person who inflicted harm upon her," the plaintiff's "grievance described her assault and her strong reaction to the assault," and the plaintiff "describe[d] having a serious reaction to the assault, including . . . visibly shaking, . . . having flashbacks . . . , finding the experience 'horrifying,' and that the assault triggered fear and haunted her," and explaining "[a]lthough [the plaintiff's] grievance form describe[d] some psychological harm, even if [the plaintiff did] raise issues of material fact regarding the extent of her knowledge regarding her psychological harm, that [did] not create an issue of material fact for purposes of the discovery rule"); *Doe, 7 v. Josephine County*, 697 F. App'x 567, 568-69 (9th Cir. 2017) (affirming the district court's entry of summary judgment in the defendant's favor on the plaintiffs' state and federal claims, explaining that the plaintiffs' "federal claims accrued at the time the [p]laintiffs

recognized they had suffered some harm and knew the identity of the tortfeasor, even if a different kind of harm arose years later," and "[a] separate claim does not accrue and the statute of limitations [was] not tolled even if the [p]laintiffs were not aware that the psychological problems they [were] suffering as adults were caused by the abuse," and adding that the "[p]laintiffs' state law claims [were] barred by Oregon's [applicable] statute of limitations for the same reasons the federal claims [were] barred") (simplified).

The record is clear that Defendant suffered additional and profound harm as a result of the May 2022 incident, which Bick-Mera's PTSD diagnosis confirms. However, the record also reflects that Defendant suffered harm much earlier and a victim of abuse need not know the full extent of her harm for the limitations period to begin. *See generally Wilson v. Or. ex rel. Dep't of Corr.*, No. 3:20-cv-2078-SI, 2021 WL 3779630, at *4 (D. Or. Aug. 25, 2021) ("A plaintiff need not know the full extent of her harm for the limitations period to begin. . . . '[According to the Oregon Supreme Court,] [i]f a plaintiff knows that he or she has suffered *some* harm and knows that it is the result of tortious conduct, an argument that the plaintiff did not know the full extent of the harm . . . will be of no avail.' . . . [The plaintiff] knew at least that she had been sexually assaulted and had suffered at least some harm warranting damages. Even if [the plaintiff] was unaware of the full extent of her harm, including her psychological harm, that does not extend the running of the statute of limitations." (quoting *Doe 1*, 353 Or. at 335)); *see also id.* (noting that the plaintiff "identif[ied] [a defendant] as the person who inflicted harm upon her," the plaintiff's "grievance described her assault and her strong reaction to the assault," and the plaintiff previously "describe[d] having a serious reaction to the assault, including . . . visibly shaking, . . . having flashbacks . . . , finding the experience 'horrifying,' and that the assault triggered fear and haunted her," and explaining "[a]lthough [the plaintiff's] grievance form

describe[d] some psychological harm, even if [the plaintiff did] raise issues of material fact regarding the extent of her knowledge regarding her psychological harm, that [did] not create an issue of material fact for purposes of the discovery rule").

The relevant question before the Court is whether a reasonable person in Defendant's circumstances in the exercise of reasonable care should have discovered the causal connection between Plaintiff's abuse and the resulting injuries before September 29, 2018 and made further inquiry to determine if Defendant had a legal claim. *See* OR. REV. STAT. § 12.117(1); *see also Doe 150*, 2010 WL 11531082, at *5 (holding that the relevant inquiry is twofold: (1) whether, in light of the facts and occurrences of which the plaintiff was aware, "a reasonable person of ordinary prudence who [knew that she] had suffered childhood sex abuse at [the defendant's] hands would necessarily have made 'further inquiry' to determine whether [she] might have a claim against [the defendant] . . . arising out of [the] abuse," or (2) "even absent . . . further inquiry[, such a person] would necessarily have been aware of the 'substantial possibility' that such a claim might lie"); *see also Doe 150*, 469 F. App'x at 642-43 (affirming).

The undisputed factual record reflects that Defendant (1) never forgot or repressed her memories of the childhood sexual abuse; (2) suffered emotional distress resulting from the abuse for at least several years in early adulthood as reflected by expert testimony, as well as evident in Defendant's own testimony recounting her repeated reports of the abuse to family members, emotional meetings and fights with her uncles, strong emotional reactions to Plaintiff's presence, demands for an appropriate "punishment" for the harm Plaintiff caused, and continued demands for action when her uncles failed adequately to respond to her reports and requests for punishment; and (3) was aware that Plaintiff's abuse violated the law and that there could be "legal means" to "punish" him. (*See* Def.'s Answer, Affirmative Defs., & Countercls. ¶ 17;

PAGE 35 – OPINION AND ORDER

Def.'s Trial Br. at 2, suggesting that Defendant knew that that decades earlier, her mother witnessed and reported Plaintiff's abuse to authorities in Afghanistan, and took her for a medical evaluation and treatment; Def.'s Dep. 140:20-144:22, 152:3-157:20, 158:3-161:10; Def.'s Am. Resp. Pl.'s Interrogs. at 4-5, reflecting that Defendant "wouldn't give up" for five years in the 1990s, "kept asking [her uncles] to do something," and continued to implore her uncles to "take actions" to "punish" Plaintiff or "let somebody else punish [Plaintiff] if they couldn't do it," to "protect" her, to "get [Plaintiff] out of [her] life," and to prevent her from "hav[ing] to see the person who" abused her, and "suggest[ing] legal means" to punish Plaintiff; Def.'s Dep. 157:16-20, 160:4-21, demonstrating that Defendant expected "[w]hatever the punishment for [a] child molester was").

In light of these undisputed facts, the Court concludes that a reasonable person in Defendant's circumstances should have discovered in the exercise of reasonable care the causal connection between Plaintiff's abuse and Defendant's injuries before September 29, 2018, and that no reasonable jury could reach a different conclusion. Accordingly, Defendant's counterclaims are time barred as a matter of law and the Court must enter summary judgment for Plaintiff.

## CONCLUSION

For these reasons, the Court GRANTS summary judgment to Plaintiff on Defendant's counterclaims, CANCELS the jury trial, and DENIES all pending motions as moot.

**IT IS SO ORDERED.**

DATED this 30th day of August, 2024.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge